UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PATRICIA REHR,

       Plaintiff,

                      **MEMORANDUM AND ORDER**

 - against -

                      04-CV-5577 (DRH) (ARL)

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**A P P E A R A N C E S :**

**WILLIAM J. EPPIG, ESQ.**
Attorney for Plaintiff
1175 Montauk Highway, Suite 5
West Islip, New York 11795

**ROSLYNN R. MAUSKOPF,
UNITED STATES ATTORNEY**
Attorney for Defendant
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201
By: John M. Kelly, Special Assistant U.S. Attorney

**HURLEY, District Judge:**

*INTRODUCTION*

    Plaintiff Patricia Rehr ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner" or "Defendant") which partially denied her claim for disability benefits. Specifically, the Commissioner found that Plaintiff had met the definition of statutory blindness as of January 4, 1999, and was therefore disabled as of that date, but was not disabled for the period of July 1, 1996 to January 3, 1999. Presently before the Court are Plaintiff's and

Defendant's motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). For the reasons discussed below, Plaintiff's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

*I.      Procedural Background*

Plaintiff applied for disability benefits on March 18, 1997. (Tr. at 137-140.)[1] Plaintiff claimed that she was disabled due to "myopic degeneration"[2] and vision loss. (*Id.* at 191.) After the application was denied initially and upon reconsideration, (*id.* at 87-88, 106-09, 114-16), Plaintiff requested a hearing. (*Id.* at 117-18.) On October 7, 1997, a fully favorable decision was entered by an Attorney Advisor finding that Plaintiff was disabled since July 1, 1996. (*Id.* at 89-93.)

On March 20, 1998, the Appeals Council reopened the Attorney Advisor's decision finding that a "revised decision is necessary." (*Id.* at 95.) After remanding the case to an Administrative Law Judge ("ALJ"), (*id.* at 111-13), and after a hearing held on September 16, 1998, ALJ William Ingram issued a fully favorable decision on September 22, 1998, again finding that Plaintiff had been disabled due to visual impairment since July 1, 1996. (*Id.* at 101.)

On November 19, 1998, the Appeals Council, on its own motion, reviewed ALJ Ingram's decision and found it to be "contrary to the weight of the evidence currently of record." (*Id.* at 103.) The Appeals Council further found that because Plaintiff's vision was better than

---

[1] References to "Tr." are to the Administrative Record filed in this case.

[2] Myopia is commonly referred to as nearsightedness. *See Stedman's Medical Dictionary* 1175 (27th ed. 2000).

20/200 in her right eye, her impairment did not meet the statutory definition of blindness, viz. a "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens." 42 U.S.C. § 416(i)(1)(B); *see also* 20 C.F.R. § 404.1581.

Thereafter, Plaintiff submitted additional evidence to the Appeals Council suggesting that she was statutorily blind as of January 4, 1999, and possibly earlier.[3] (*Id.* at 120.) By Order dated February 10, 1999, the Appeals Council once again remanded the case to an ALJ. (*Id.* at 119-21.) The Appeals Council instructed that Plaintiff should be given an opportunity to appear at a hearing and that medical expert evidence be obtained. (*Id.* at 120-21.)

On June 15, 1999, Plaintiff appeared before ALJ Richard Karpe. (*Id.* at 37-58.) ALJ Karpe considered Plaintiff's claims de novo and on June 25, 1999, issued a partially favorable decision finding that Plaintiff was statutorily blind as of January 4, 1999, but not prior thereto. (*Id.* at 18-24.) Plaintiff moved for review of this decision. By Order dated November 1, 2002, the Appeals Council vacated ALJ Karpe's Order with respect to the period prior to January 4, 1999, and remanded the case for further administrative proceedings. (Id. at 270-72.)

In vacating ALJ Karpe's decision, the Appeals Council found that there was conflicting evidence in the record as to whether Plaintiff had lost central visual acuity in her right eye prior to January 4, 1999, so as to meet the statutory definition of blindness.[4] Although Plaintiff claimed that she had no central acuity in her right eye prior to January 4, 1999 because

---

[3] With regard to Plaintiff's claim of statutory blindness prior to January 4, 1999, the Appeals Council noted that Plaintiff's evidence suggested "that detailed visual field testing if done in the past may reveal limitations in central visual field acuity that meet the requirement" of the statute. (Tr. at 120.)

[4] Plaintiff's vision in her right eye was first recorded at 20/200 on January 4, 1999.

3

her "fovea had been destroyed,"[5] (*id.* at 271), the Appeals Council was troubled by the fact that several of Plaintiff's treating doctors had reported that Plaintiff had a visual acuity in her right eye of at least 20/70 prior to this date, which "would not appear to be possible if [Plaintiff's] fovea had been completely destroyed." (*Id.*; *see also id.* (noting that visual acuity of 20/70 "suggest[ed]" that central vision had not been "obliterate[d]".) Finding a conflict in the record as to the medical evidence, the Appeals Council instructed that upon remand, the ALJ should obtain the testimony of an ophthalmologist or other specialist who

> will be asked to address the question of whether the medical records establish that [Plaintiff's] fovea was destroyed . . . during the period from July 1, 1996 to January 4, 1999 and, if so, what effect it had on her central visual acuity. The medical expert will be asked to comment on whether the visual acuity figures given during this period by various examiners represent central visual acuity as defined in [the appropriate regulations].

(*Id.* at 271.)

Upon remand, Plaintiff appeared before ALJ Karpe on September 3, 2003. (*Id.* at 59-86.) After considering Plaintiff's claim de novo, ALJ Karpe issued a decision on September 25, 2003, once again finding that Plaintiff was not statutorily blind prior to January 4, 1999, but that she had been statutorily blind since that date. (*Id.* at 10-16.) It is this decision which is the subject of the instant appeal. The ALJ's decision became final when the Appeals Council denied Plaintiff's request for review on October 27, 2004. (*Id.* at 4-8.)

---

[5] A fovea is an area consisting of a small depression in the retina where vision is most acute. *See Stedman's Medical Dictionary* 709 (27th ed. 2000); Merriam-Webster's Medical Dictionary (Revised ed. 2002).

4

## II. Factual Background

### A. The Medical Evidence

The medical evidence before ALJ Karpe is briefly summarized below.

#### 1. Dr. Weber

In a letter dated July 16, 1996, Dr. Pamela Ann Weber, an ophthalmologist, reported that she evaluated Plaintiff on July 9, 1996. (Tr. at 250.) Upon examination, Plaintiff's "visual acuity with correction" in the right eye was 20/70. (*Id.*) That same day, Plaintiff underwent laser treatment or photocoagulation in her right eye "in an attempt to control the lesion and prevent further loss of vision." (*Id.* at 251.)

On January 14, 1997, Dr. Weber reported that Plaintiff's "visual acuity" on January 9, 1997 was 20/70 and that Plaintiff "has a very difficult time working as she has lost her central vision." (*Id.* at 223.) Dr. Weber provided a third and final report on October 2, 1997 which indicated that Plaintiff's "visual acuity with correction" was 20/60 in the right eye. She further stated that Plaintiff had "a large central scotoma in both eyes."[6] (*Id.* at 247.)

#### 2. Dr. Gnadt

On May 29, 1997, Dr. Gwen Gnadt, an optometrist, provided a report regarding Plaintiff's condition. She indicated that as of Plaintiff's last visit, May 29, 1997, Plaintiff's "distant vision" with correction in her right eye was 20/60. (*Id.* at 236.) She also indicated that Plaintiff had "central vision loss" in both eyes. (*Id.*)

On June 23, 2003, Dr. Gnadt submitted a letter answering specific questions

---

[6] A scotoma is "an area of partial or complete blindness within the confines of a normal or a relatively normal visual field." (Tr. at 278.)

posed by Plaintiff's counsel. (*Id.* at 277.) Dr. Gnadt indicated that central vision "is that vision [which] is in the center of one's monocular visual field. This has been described as a 'hill of vision' with the apex being the point of fixation." (*Id.*) In response to the question of whether Plaintiff has any central vision, Dr. Gnadt responded, "Technically no. She has a central scotoma and some paracentral vision in her right eye. With the use of high magnification at near and a decreased working distance, she can read 20/40 print with effort but not comfortably." (*Id.*) Dr. Gnadt further stated that Plaintiff first lost her central vision prior to August 12, 1996. (*Id.*)

### 3. Dr. Lebowitz

On January 7, 1999, Dr. Mark A. Lebowitz, an ophthalmologist, reported that he examined Plaintiff on January 4, 1999 and that her "best-corrected visual acuity was 20/200 [in the] right eye" and that "testing showed severe compromise of central visual field in both eyes." (*Id.* at 254.) On July 21, 1999, Dr. Lebowitz submitted a letter to Plaintiff's counsel, responding to testimony provided by Dr. Greenberg at the hearing before ALJ Karpe, discussed *infra*. Dr. Lebowitz stated that:

> As an ophthalmologist it is my sincere opinion that [Plaintiff] does not have central visual acuity because she does not have central vision, because she does not have a fovea, a foveola, or much of her central macula in tact [sic] in either eye. To reiterate it is my sincere opinion that central vision is that vision associated with the fovea and the surrounding foveolar and muscular tissue.

(*Id.* at 275.)

### 4. Dr. O'Brien

Plaintiff was seen for a disability evaluation on May 13, 1997 by Dr. John O'Brien from Suffolk Ophthalmology Associates, P.C. (*Id.* at 233.) Dr. O'Brien reported that

6

Plaintiff's "vision" was 20/70 in the right eye and that she had "some loss of central vision in the left eye." (*Id.*) There is no mention of any loss of central vision in the right eye.

### 5. *Dr. Malik*

On June 12, 1997, Dr. M. Malik, a state agency medical consultant, provided an assessment of Plaintiff's residual functional capacity. (*Id.* at 239-46.) The doctor indicated that the only limitations Plaintiff had were visual ones. (*Id.* at 240-43.) He further noted that Plaintiff had myopia and visual acuity of 20/70 in the right eye with "adequate field." (*Id.* at 242.)

### 6. *Dr. El Baba*

On September 9, 1998, Plaintiff was examined by Dr. Fadi El Baba, M.D. (*Id.* at 253.) Upon examination, Plaintiff's "visual acuity" was 20/70 in the right eye. (*Id.*)

### 7. *Dr. Greenberg*

At the administrative hearing held on September 3, 2003, Dr. Jack Greenberg, a board-certified ophthalmologist, appeared and testified. (*Id.* at 64-85.) Dr. Greenberg testified that because Plaintiff had visual acuity of 20/70 in the right eye, she did not meet the definition of statutory blindness. (*Id.* at 65.) Essentially, Dr. Greenberg stated that Plaintiff's vision of 20/70 in the right eye had to be her *central* vision because it was not possible to have 20/70 *peripheral* vision. (*Id.* at 72 ("[T]he peripheral vision cannot attain 20/70 vision.").) He defined central vision as "[t]he ability to see when you're looking at something" and distinguished it from peripheral vision. (*Id.* at 73.) He further noted that peripheral vision, or paracentral vision, could not have enabled Plaintiff to achieve a result of 20/40 on her eye test, as recorded by Dr. Gnadt. (*Id.* at 77; *see also id.* at 79 ("[S]he does have central vision if she can read 20/40.").)

7

In response to Plaintiff's counsel's question regarding Dr. Lebowitz's January 4, 1999 report indicating that Plaintiff had no foveas, Dr. Greenberg stated that he did not dispute this, noting that Plaintiff's condition was progressive, and that, as of January 4, 1999, Dr. Lebowitz's statement could be accurate. (*Id.* at 78.)

### B. *The ALJ's Decision*

In his decision, ALJ Karpe synopsizes the findings of Drs. Weber, El Baba, Lebowitz, and Gnadt and then discusses Dr. Greenberg's testimony as follows:

> Dr. Greenberg stated that [Plaintiff] could not have had 20/60 vision [as determined by Drs. Weber and Gnadt] if her fovea were anatomically removed, and therefore, he disagreed with Dr. Gnadt's statement that she had lost her central vision prior to August 1996. If she had only paracentral vision, she could not have achieved the vision that Dr. Weber and Dr. El Baba recorded. Furthermore, [Plaintiff] has not had peripheral visual training. [Plaintiff] did not have an absolute loss of vision prior to January 1999. By January 1999, [Plaintiff's] vision was severely worse than it was in 1996, and by January 1999, [Plaintiff] met the qualifications for statutory blindness. Dr. Greenberg opined that [Plaintiff] was not statutorily blind until January 4, 1999.
>
> The [ALJ] is in agreement with Dr. Greenberg, and so find that prior to January 4, 1999, [Plaintiff] was not statutorily blind . . . .

(*Id.* at 14-15.)

### C. *The Appeals Council's Decision*

On October 27, 2004, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Specifically, the Appeals Council found that Dr. Greenberg's testimony was "consistent with the record as a whole and, therefore, the decision of the [ALJ], which places substantial weight on that testimony, is supported by substantial evidence." (*Id.* at 5.)

## III.     *The Issue on Appeal*

Pursuant to 20 C.F.R. § 404.130(a) and (e), a person will be deemed to have disability insured status is she is statutorily blind and "fully insured." *Id.* Here, the parties agree that the only issue on appeal is whether the ALJ erred in finding that Plaintiff was not statutorily blind from July 1, 1996 to January 4, 1999. For the reasons stated below, the Court finds that the ALJ's decision should be affirmed.

## DISCUSSION

## I.     *Standard of Review*

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).

## II.     *Application*

As noted above, the Social Security Act defines "blindness" as "central visual

acuity of 20/200 or less in the better eye with the use of a correcting lens." 42 U.S.C. § 416(i)(1)(B); *see also* 20 C.F.R. § 404.1581. Here, it is undisputed that Plaintiff was statutorily blind in the left eye. Thus, the only issue is whether the ALJ's finding that Plaintiff was not statutorily blind in her right eye prior to January 4, 1999 was "based upon legal error or is not supported by substantial evidence."

### A. The Parties' Arguments

Plaintiff claims that ALJ Karpe's decision should be reversed because the ALJ applied the wrong legal standard and because his decision was against the weight of the evidence. With regard to the former, Plaintiff contends that the statute and regulations refer to the loss of *central* visual acuity, not visual acuity, and that her treating doctors' findings that she had visual acuity of at least 20/70 in her right eye during the relevant time period refers to visual acuity, not central acuity. Therefore, Plaintiff claims that despite her 20/70 visual acuity in her right eye prior to January 4, 1999, she lacked *central* acuity in her right eye at that time. More specifically, Plaintiff asserts:

> The word "central is part of the statute. "Central visual acuity" is not the same as "visual acuity." A normal person has central vision and paracentral vision (T277-280). Where a person has a central scotoma, that person does not have any central vision. That is because the scotoma obstructs the point of fixation. This person must move the spot to one side in order to see. This is not an easy task.

(Pl.'s Mem. at 6.)

Next, Plaintiff argues that the ALJ failed to accord proper weight to the opinions of her treating doctors. In this regard, Plaintiff relies on: (1) Dr. Weber's January 14, 1997 report that Plaintiff had "lost her central vision"; (2) Dr. Gnadt's May 29, 1997 report that

10

Plaintiff had "central vision loss" in both eyes; and (3) Dr. Gnadt's June 23, 2003 letter indicating that "[t]echnically," Plaintiff had lost her central vision prior to August 1996.

In response, the Commissioner does not dispute that the statute requires a loss in central acuity. However, the Commissioner contends that "[e]ven assuming a significant distinction between visual acuity and central visual acuity, Dr. Greenberg testified that plaintiff's vision of 20/70, as ascertained by her treating physician, Dr. Weber, did, in fact, represent plaintiff's central visual acuity." (Def.'s Mem. at 13-14 (citing Tr. at 72.).) Moreover, the Commissioner argues that the ALJ properly gave more weight to Dr. Greenberg's testimony than to the reports given by Plaintiff's treating physicians because Dr. Greenberg's testimony was "far more detailed." (Def.'s Mem. at 14.) The Commissioner also contends that Dr. Gnadt's opinion is unclear because in response to the question of whether Plaintiff had any central vision, Dr. Gnadt responded, "Technically no." (Tr. at 277.)

Finally, the Commissioner notes that in Plaintiff's disability application, filed in March 1997, Plaintiff indicates that she is still driving although she cannot drive far. (Tr. at 214.) The Commissioner contends that Plaintiff's claim that she had no central vision as of July 1, 1996 is "rendered untenable" given this admission by Plaintiff. (Def.'s Mem. at 15.)

### B. *The ALJ's Decision is Supported by Substantial Evidence and is not in Error*

#### 1. *The Treating Physician Rule*

In agreeing with Dr. Greenberg, ALJ Karpe gave his testimony controlling weight over the reports of two of Plaintiff's treating doctors, Drs. Weber and Gnadt, who both found that Plaintiff had lost central vision in her right eye prior to January 4, 1999. Although the parties dispute the propriety of the ALJ's decision in this regard, neither party cites to any

11

relevant authority. Nonetheless, the law in this area is well-established.

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when, as here, the treating physician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other medical experts. *Halloran,* 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id.* § 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ's September 25, 2003 decision does not explicitly address any of the relevant factors. Thus, "it is unclear on the face on the ALJ's opinion whether the ALJ considered (or was even aware of) the applicability of the treating physician rule." *Halloran*, 362 F.2d at 32. In *Halloran*, the Second Circuit, faced with similar circumstances, conducted "a

searching review of the record to assure [that the claimant] received the rule's procedural advantages." *Id.* Although the court noted that it does not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion," *id.*, because the court found that the ALJ nonetheless "applied the substance of the treating physician rule," *id.*, the court found no reason to remand. *Id.* at 33; *see also id.* at 32 ("[T]he substance of the treating physician rule was not traversed.").

### 2. ALJ Karpe Applied the Treating Physician Rule in Substance

In this case, after carefully considering the entire record and the ALJ's decision, the Court concludes that the ALJ "applied the substance of the treating physician rule" and that his decision is supported by substantial evidence. In reaching his determination, the ALJ considered the opinions of many different doctors, including four of Plaintiff's treating doctors. He briefly reviewed the length, nature, and extent of their treatment. He noted that under the care of these doctors, Plaintiff repeatedly reported vision of at least 20/70 in her better eye, thereby noting the consistency of the treating doctors' opinions with the entirety of the record. He then noted Dr. Greenberg's opinion that Plaintiff could not have achieved such vision results had Plaintiff lost her central vision in this eye at the time of testing and that, therefore, Dr. Greenberg disagreed with Dr. Gnadt's statement that Plaintiff had lost her central vision prior to August 1996. Ultimately, he agreed with Dr. Greenberg that Plaintiff was not statutorily blind until January 4, 1999.

In adopting Dr. Greenberg's position, the ALJ accorded his testimony more weight than the opinions of Dr. Weber and Dr. Gnadt, two of Plaintiff's treating doctors. However, the opinions submitted by these doctors were not particularly informative and were not

13

necessarily consistent with those of other doctors.  For example, Dr. Weber's report does not explain the difference, if any, between central acuity and visual acuity, and how Plaintiff could have tested at 20/70 or better in her right eye if she had no central vision.  Dr. Gnadt's report was equally ambiguous.  In response to Plaintiff's counsel's question as to whether Plaintiff had any central vision, Dr. Gnadt responded, "Technically no" and that Plaintiff "can read 20/40 print with effort but not comfortably."  (Tr. at 277.)

Moreover, Dr. Greenberg's testimony is consistent with the report given by Dr. O'Brien who reported that Plaintiff had some central vision loss in her left eye but makes no mention of any central vision loss in Plaintiff's right eye.  (*Id.* at 233.)  Similarly, neither Dr. Malik nor Dr. El Baba, who examined Plaintiff in 1997 and 1998, respectively, and noted her vision as 20/70 in her right eye, made any reference to a loss of central vision.

Finally, Dr. Greenberg's opinion that Plaintiff had to have central vision in her right eye prior to January 4, 1999 is consistent with Plaintiff's statement in March 1997 that she was still able to drive, although she could not drive far.  (Tr. at 214.)

In sum, the Court finds that ALJ Karpe's finding that the opinion of Dr. Greenberg was entitled to controlling weight is supported by the substantial evidence.  Accordingly, the September 25, 2003 decision is affirmed in its entirety.

## *CONCLUSION*

For all of the reasons stated above, Plaintiff's motion for judgment on the

pleadings is denied; the Commissioner's motion for judgment on the pleadings is granted. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
May 9, 2006

/s                    
Denis R. Hurley
United States District Judge